No. 27,994.

THE STATE OF KANSAS, ex rel. WILLIAM A. SMITH, Attorney-general, *Appellee,* v. JOHN W. KEMP et al., *Defendants;* PAUL SCHLEICHER and MARY SCHLEICHER, His Wife, and KATHERINE C. ROE, *Appellants;* LINCOLN AND LEE UNIVERSITY, of Kansas City, *Appellee.*

(261 Pac. 556.)

### SYLLABUS BY THE COURT.

EMINENT DOMAIN — *Public Use — Preservation of Historical Interest.* The statute providing that any tract of land invested with unusual historical interest may be taken for the use and benefit of the state by condemnation, specifies the use, and the use is a public use.

Appeal from Johnson district court; GARFIELD A. ROBERDS, judge. Opinion filed December 10, 1927. Affirmed.

*Joseph H. Brady* and *T. F. Railsback,* both of Kansas City, for the appellants.

*William A. Smith,* attorney-general, *Ray H. Calihan,* assistant attorney-general, *Howard Payne,* county attorney, *A. M. Harvey* and *Randal C. Harvey,* both of Topeka, for appellee the State of Kansas; *Leslie J. Lyons,* of Kansas City, Mo., for appellee Lincoln and Lee University.

The opinion of the court was delivered by

BURCH, J.: The state condemned a tract of land forming the site of the historic Shawnee Mission, in what is now Johnson county, Kansas, and certain of the landowners appeal from the judgment of condemnation.

In 1921 the legislature passed an act which reads as follows:

"That the power of eminent domain shall extend to any tract or parcel of land in the state of Kansas which possesses unusual historical interest. Such land may be taken for the use and benefit of the state by condemnation as herein provided.

"Whenever the legislature shall pass a joint resolution, declaring that a specifically described tract or parcel of land is invested with unusual historical interest, the nature of which shall be described, the attorney-general shall forthwith file condemnation proceedings in the district court of the county where the land is situated, in the name of the state: *Provided,* That this state may accept and hold such property by gift or devise without any resolution." (R. S. 26-301, 26-302.)

Succeeding sections provided for assessment of damages by appraisers appointed by the district court, report of the appraisers,

Eminent Domain, 20 C. J. pp. 549 n. 43, 586 n. 6.

notice to interested persons and opportunity to be heard in the district court on the appraisers' report, authority of the district court to approve, disapprove or modify the report, order of condemnation, and payment of claims. In 1927 the legislature passed a joint resolution declaring the Shawnee Mission lands and buildings to be of unusual historical interest, and providing for acquiring the land and buildings by condemnation. The land was described, the nature of the historical interest was described, and sections 3 and 4 read as follows:

"That said land be taken for the use and benefit of the state of Kansas by condemnation as provided by law.

"That upon the taking over of said property by the state, the governor shall designate the state historical society the custodian thereof, and he shall direct the secretary of the state historical society, the state architect, and one other person designated by the governor, to make a survey of said property and recommend such measures as they may deem necessary and advisable for the proper preservation and restoration of said property." (Laws 1927, ch. 205.)

At the same session the legislature passed an act making an appropriation to pay the cost of condemnation, and making a further appropriation for the restoration, improvement, and maintenance of the land and buildings. Section 7 reads as follows:

"The said board created by section 4 of said house joint resolution No. 1 shall have the management and control of said real estate after the same is reduced to the possession of the state of Kansas, and is authorized to do all things necessary to and consistent with the use of the same by the state, as a place of unusual historical interest." (Laws 1927, ch. 71.)

Pursuant to this legislation, appraisers were appointed, who made an appraisement and filed a report. Notice was given of the time and place of hearing on the report. The landowners appeared, and were heard. The court made findings of fact and stated conclusions of law, and entered an order of condemnation.

The appeal of Katherine C. Roe best discloses that which is relied on as a fundamental defect in the proceeding. The condemned land lies about one mile south of the city limits of Kansas City, Kan., and about one and one-half miles west of the city limits of Kansas City, Mo. The portion belonging to Miss Roe was taken from a tract of 165 acres bounded on the north and east by residential additions and subdivisions, some of which are highly developed and restricted districts. Her land is adapted, or is likely soon to become adapted, to similar use. She contends she is greatly interested in knowing to what precise use the condemned land is

to be put; one kind of use may enhance and another kind may detract from the value of the land not taken; she, the appraisers, and the court, should be informed by the statute itself what that use is to be, in order that she may be compensated for the taking; and the statute is fatally defective, in that it merely declares land of unusual historical interest may be taken for the use and benefit of the state.

The statute provides that the state may accept and hold places of unusual historical interest by gift and by devise. It may also take by condemnation, and it seems to the court the notion the state might acquire places invested with ususual historical interest for use as prison farms and insane asylums, is far-fetched. The meaning of the statute is clear enough, that places invested with unusual historical interest may be acquired by the state by gift, devise, or condemnation, for the use and benefit of the state, as places of that character. If there were any doubt about this, the joint resolution and the appropriation act relating to acquisition of the Shawnee Mission interpret the eminent domain statute, and show what the legislative intention was. The state historical society is to be custodian of the place. On taking it over, a qualified person is to make a survey and recommend measures for proper preservation and restoration of the mission, and all things are to be done necessary to and consistent with use of the place by the state as a place of unusual historical interest.

There is further indication that withdrawal from private ownership and acquisition by the state means the place thereby becomes a memorial of that which gave it unusual historical interest. The legislature which enacted the condemnation statute passed an act providing that counties may issue bonds for the erection of buildings, memorial arches, and other structures, construct memorial boulevards, and establish memorial parks, commemorative of the valorous achievements of men and women in various branches of service in the world war. (R. S. 73-401.) When some house or other building, or some place, becomes hallowed on account of its historical association, it is itself a memorial, if set free from the material uses incident to private ownership, and the two statutes are companion statutes, designed to perpetuate remembrance of that which ought not to be forgotten.

The court concludes the statute designates the specific use the state is to make of the places it may acquire.

State, *ex rel.*, v. Kemp.

· Those who appeal contend a landowner may not be deprived of his property except for public use and in case of public necessity; that the legislature is not the final judge of public use or necessity; and that the use proposed to be made of the Shawnee Mission is not a public use justified by necessity. Authorities are cited, on the basis of which counsel say a decision is possible marking the line between what the state may take and what it may not take by exercise of the right of eminent domain. Counsel would earn the right to a monument commemorative of their achievement if they could enable the court to render such a decision. But the affairs of men are not static. They change, even while the judicial hand is attempting to draw the line, and if a fairly serviceable universal rule were promulgated to-day, some new social need would arise to-morrow which would require a new formulation. In the opinion in the zoning ordinance case decided last year, the supreme court of the United States, speaking by Mr. Justice Sutherland, said:

· "In the realm of constitutional law, especially, this court has perceived the embarrassment which is likely to result from an attempt to formulate rules or decide questions beyond the necessities of the immediate issue. It has preferred to follow the method of a gradual approach to the general by a systematically guarded application and extension of constitutional principles to particular cases as they arise, rather than by out-of-hand attempts to establish general rules to which future cases must be fitted." (*Euclid v. Ambler Co.*, 272 U. S. 365, 397.)

Pursuing that method leaves the way open for progress in the law.

The state is not obliged to debate its needs with any property owner. The state determines for itself whether, in a given case, an exercise of the power of eminent domain is needful. The question is political, and the state is not obliged to provide any tribunal in which interested persons may be heard on that question. (Cooley's Constitutional Limitations, 7th ed., p. 777.) When, in the exercise of political sovereignty, the legislature resorts to eminent domain, it determines that the use to which the condemned property is to be put is a public use. When its action is challenged by the landowner, the question, "What is a public use?" is one of law. In deciding the question the court will give respectful consideration to the judgment of the legislature, and will sustain it unless it be manifestly ill founded, but the legislature's judgment is not conclusive. This brings us to the question whether use by the state of places ·invested with unusual historical interest is a public one.

That the Shawnee Mission is a place invested with unusual historical interest is not disputed or open to dispute, and the entrancing tale need not be told here. It is sufficient to say the mission was founded by the Methodist Church as an Indian mission in 1829. Its buildings, made of brick burned on the spot, and timber cut on the banks of a near-by stream, were the first substantial habitations in a vast region now divided into populous and prosperous states. For many years the mission remained the farthest permanent outpost of western civilization, and life at the mission forms a chapter of absorbing interest, not only in the history of Kansas, but in the history of missionary methods of promoting civilization. Three of the buildings are still standing, and when legislation to acquire them was initiated, one was used as the residence of a truck gardener, another as a dairy, and another as a roadhouse. On the repeal of the Missouri Compromise and the reopening of the "irrepressible conflict" between freedom and slavery, by passage of the Kansas-Nebraska act in 1854, the first territorial governor established executive offices in one of the buildings, and other territorial officials were quartered there. After a brief session at Pawnee, the first territorial legislature adjourned to meet at the mission, and there, among other notable doings, enacted the famous "bogus statutes" for the government of the territory. In the momentous struggle to make Kansas a free state, the mission was a place about which raged the warfare which gave the territory the name "bleeding Kansas." The mission was occasionally used as a military post. The Santa Fe trail passed through the mission grounds, and its junction with the Oregon trail was but a short distance from the mission. Altogether, the Shawnee Mission was so intimately connected with "the conquest of civilization" and "the ordeal of civilization" in Kansas and in the western part of the United States, that if it be fitting to maintain historical shrines, the place is worthy to be preserved as one.

When life was simple, the power of eminent domain was expended in providing for simple necessities—public buildings, public ways, and other physically indispensable things. With the advancement of civilization new needs multiply. First comes that which is natural, and afterward that which is spiritual, and cultural needs become just as cogent as the material needs of pioneer days were. The framers of the constitution of the state of Kansas understood this. The constitution makes it mandatory upon the legislature to encourage the promotion of intellectual and moral improvement

State, *ex rel.*, v. Kemp.

(art. 6, § 2). A specific method of encouragement is prescribed—establishment of a uniform system of common schools and schools of higher grade, embracing college and university departments. The method is not exclusive. The legislature must do that much, but it may resort to other methods perfected in the course of social progress. The end to be subserved by state promotion of intellectual and moral improvement is better citizenship; and good citizenship is inculcated by giving attention to history as history is now conceived. History is no longer a record of past events. It is an illuminating account of the expanding life of man in all its manifestations, revealing how each stage of civilization grows out of preceding stages, revealing how the past still lives in us and still dominates us, and enabling us to profit by what has gone before. So considered, history is inspirational. The Santa Fe and Oregon trails are not merely old-time routes of trade and emigration, whose furrows in the earth's crust interfered with tillage when agriculture developed along their courses; they are highways of the indomitable spirit of man in earnest and arduous quest and fired with passion of purposeful endeavor. Considered in this way, the career of man and the careers of men stir the emotions, arouse enthusiasm and awaken zeal which fuse into patriotism; and patriotism is regarded as a worthy quality of citizenship. If therefore, the Shawnee Mission, rescued from private ownership, and restored, protected, and preserved by the state, will bear tidings to this and future generations of the vicissitudes, the perplexities and the frustrations, the consecrated devotion, the dauntless bravery, and the splendid achievements denoted by the inscription on the state's great seal, "*Ad astra per aspera*," and will do this with a power upon the hearts and lives of men and women which will make for better citizenship, the use is a public one.

As evidence of the efficiency of historical memorials as influences affecting citizenship, the legislature had before it the work of a multitude of patriotic societies having many thousands of members. The chief aim of these organizations is to perpetuate the memory of service to country in order to develop an increasing love of country. To this end they have secured the preservation of many historic houses and other buildings and of historic places, have erected monuments commemorative of historic events, have erected statutes, and have raised commemorative tablets and other memorials. The society of the Daughters of the American Revolution undertook the

46—124 Kan.

marking of great roadways, including the Santa Fe trail. Besides this evidence, the legislature had before it the example of the appropriation of private property for use by the United States in restoring, preserving and marking the Gettysburg battlefield. Two distinct questions were involved: first, was the proposed use a public use, and second, if the use were a public one, under what if any of its limited powers could congress make the appropriation? In the opinion of the supreme court of the United States sustaining the appropriation, it was said that valuable lessons in the art of war might be learned from an examination of the battlefield in connection with events which took place there; but the decision was based on broader ground:

"Can it be that the government is without power to preserve the land, and properly mark out the various sites upon which this struggle took place? Can it not erect the monuments provided for by these acts of congress, or even take possession of the field of battle in the name and for the benefit of all the citizens of the country for the present and for the future? Such a use seems necessarily not only a public use, but one so closely connected with the welfare of the republic itself as to be within the powers granted congress by the constitution for the purpose of protecting and preserving the whole country. It would be a great object lesson to all who looked upon the land thus cared for, and it would show a proper recognition of the great things that were done there on those momentous days. By this use the government manifests for the benefit of all its citizens the value put upon the services and exertions of the citizen soldiers of that period. Their successful effort to preserve the integrity and solidarity of the great republic of modern times is forcibly impressed upon every one who looks over the field. The value of the sacrifices then freely made is rendered plainer and more durable by the fact that the government of the United States, through its representatives in congress assembled, appreciates and endeavors to perpetuate it by this most suitable recognition. Such action on the part of congress touches the heart, and comes home to the imagination of every citizen, and greatly tends to enhance his love and respect for those institutions for which these heroic sacrifices were made. The greater the love of the citizen for the institutions of his country the greater is the dependence properly to be placed upon him for their defense in time of necessity, and it is to such men that the country must look for its safety. The institutions of our country which were saved at this enormous expenditure of life and property ought to and will be regarded with proportionate affection." (*United States v. Gettysburg Electric Ry.*, 160 U. S. 668, 682.)

The court concludes the legislature's determination that use by the state of places invested with unusual historical interest is a public use, was well founded in law.

There is nothing else of importance in the case. Condemnation

State, *ex rel.*, v. Kemp.

by the state of the land deeded by Miss Roe to Lincoln and Lee University discharged performance of the condition subsequent inserted in the deed, and the university is entitled to the award of damages for that land. If this were not true, by the same deed Miss Roe disposed of the reversion, and she has no interest in the land or the condemnation money. The condemnation proceedings were regular. Contentions that rights protected by the constitution of the United States were violated have been considered, and are held to be without merit.

The judgment of the district court is affirmed.

HARVEY, J., not sitting.