No. 29,030.

MAUD WELCH RITCHIE, *Appellee,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

(279 Pac. 15.)

Opinion filed July 6, 1929.

*William R. Smith, Owen J. Wood, Alfred A. Scott* and *Alfred G. Armstrong,* all of Topeka, for the appellant.

*Robert Stone, James A. McClure, Robert L. Webb* and *Beryl R. Johnson,* all of Topeka, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to enjoin defendant from entering on plaintiff's land in execution of its design to relocate its route through plaintiff's and other land in Shawnee county, pursuant to

---

Eminent Domain, 20 C. J. pp. 640 n. 59, 1193 n. 18.

consummated condemnation proceedings. Defendant's demurrer to the petition was overruled, and defendant appeals.

The Atchison, Topeka & Santa Fe Railroad Company was incorporated by special act of the territorial legislature of 1859. Portions of the act follow:

"SEC. 2. The said company is hereby authorized and empowered to survey, locate, construct, complete, alter, maintain and operate a railroad, with one or more tracks, from or near Atchison, on the Missouri river, in Kansas territory, to the town of Topeka, in Kansas territory, and to such point on the southern or western boundary of the said territory, in the direction of Santa Fe, in the territory of New Mexico, as may be most convenient and suitable for the construction of such railroad; and, also, to construct a branch of said railroad to any points on the southern boundary of said territory of Kansas, in the direction of the Gulf of Mexico.

"SEC. 3. The said company is hereby authorized, and shall have the right of way upon, and may appropriate to its sole use and control, for the purposes contemplated herein, land, not exceeding one hundred feet in width, through the entire length of said road, upon such route as may be determined; and, for the purposes of depots, sidetracks, cuttings and embankments, for building engine houses and shops, or wood and water stations, may take more land, earth or material, as may be necessary for the construction or completion, operation, preserving and maintaining said road." (Private Territorial Laws of Kansas, 1859, ch. 47, §§ 2, 3.)

The authorized capital of the company was $1,500,000. About the year 1869 the company selected its route through Shawnee county, and a right of way was condemned through the land in controversy. A track was laid, and operation of the road through the county commenced about 1872. Plaintiff's brief contains the following:

"The court will take judicial notice of the fact that this is the main line of the great Santa Fe system, which runs long trains, pulled by heavy locomotives, over this road."

Whether or not it is "a notorious and indisputable geographical fact" of which the court takes judicial notice (*Worden v. Cole,* 74 Kan. 226, 230, 86 Pac. 464), it is a well-known fact that for some miles south of Topeka the road is crooked, and some of the grades are rather steep.

In 1895 the property and franchises of the railroad company were sold, pursuant to decree of the circuit court of the United States for the district of Kansas, to three individuals, who took title for the purpose of organizing a new corporation under the laws of Kansas. The new corporation was organized under the name "The Atchison,

Topeka & Santa Fe Railway Company," which is the present defendant. The certificate of incorporation recited sale of the property and franchises of the company, and stated· the purposes for which the new corporation was formed, as follows:

"To acquire, construct, own, maintain and operate a railway running from the city of Atchison, on the Missouri river, in the state of Kansas, through Topeka to a point on the western boundary of the state of Kansas, . . . and also to acquire, own, use and enjoy the railroad and appurtenances, franchises, rights, privileges and immunities, stocks and bonds, and all other properties acquired by said purchasers at said sale as above recited." ·

The capital of the new corporation was $233,486,000.

The petition which initiated the condemnation proceeding now involved employed the general language of the eminent-domain statute. The land taken is for a right of way which departs from the existing right of way through plaintiff's land, and the question presented by this appeal is whether the present company has power to relocate its railway through plaintiff's land. Plaintiff contends power to locate the road was exhausted by defendant's predecessor.

The act of 1859 granted to the railroad company power to alter its railroad, and appropriate right of way for that purpose. The word "alter" in the statute has just as much force as the words "survey, locate, and complete," which precede it. The word-sequence corresponds to the time-sequence in railroad building—survey, location, completion, and after that, alteration. Topeka was the only definitely fixed point on the line of the projected road. The road was to start on the Missouri river, at or near Atchison, and go to Topeka. From Topeka it was to go in the direction of Santa Fe and the Gulf of Mexico. The project was quite experimental, and manifestly alteration after completion, as well as after location, might be necessary. To alter meant then what it means now—to change without destroying identity, to vary without making different—and power to alter was included in the grant.

Alteration of railroad routes was not a new feature of railroad building in 1859. Early railroad charters were granted by special legislative acts. These grants, like the earlier grants to turnpike and toll-gate companies, were very strictly construed. Lines were short, and routes were specified with great particularity. Lord Coke had said that if a person once determines his election, it shall be forever; and when a company was authorized to build a railroad "passing north of the house of Willard Newton, Esq." (*Brigham v. Agricultural Branch Railroad Company*, 1 Allen [Mass.] 316), con-

struction of that road exhausted the company's power. A grant of power of eminent domain was a "delegation of sovereign power." There could be no intendment in derogation of sovereignty, any more than when sovereignty was an attribute of royalty. Power of eminent domain existed because public interest must dominate private interest. But when the power was put to work for the public welfare, private interest dominated, and the grant of power was shrunk by interpretation until a railroad charter to locate a line of road was like the piece of ass's skin in Balzac's story, with this difference—the first use made of it destroyed it. Railroad companies were compelled to return to the legislatures for enlargement of power, even to change a filed location, although the railroad had not yet been constructed. Ultimately, general acts were passed permitting change of route for specified purposes, or under specified conditions. Early legislation in Massachusetts is discussed in an interesting manner in the opinion of Chief Justice Shaw, in the case of *Boston and Providence Railroad Corporation v. Midland Railroad Company & others*, 1 Gray [Mass.] 340:

"Thus construed, with the aid of contemporaneous provisions and of prior acts, the meaning of § 73 appears to us to be this: If the act of incorporation itself has fixed the termini and intermediate stations or local objects described, with the courses and distances between them, it is itself a location, and there is no room for variation. If it has fixed the termini, and any fixed intermediate stations, without courses and distances, this section warrants a variation between the fixed stations, but no further; the intermediate fixed stations, as well as the termini, are limits, and must be observed. But if there be no fixed intermediate stations, these variations may be made anywhere between the termini, subject only to be controlled by such qualifying terms of a general nature as the act may contain, such as north of such a hill, west of such a pond, or near such a town, or over such a meadow, where the meadow is a broad one." (p. 362, March term, 1854.)

When Cyrus K. Holliday and his associates presented his splendid vision to the territorial legislature, the very remarkable charter petitioned for included the privilege known to be of importance to railroad builders of that day, privilege to alter route.

If the foreclosure proceedings which have been referred to had taken place under state law, the new company would have and might exercise the rights, privileges, grants, franchises, immunities and advantages transferred by the foreclosure sale. (R. S. 66-802.) The statute indicates the policy of the state with respect to railway foreclosures and purchases by reorganization committees. In any

event, the railway company is a simple successor of the railroad company, or it is a new company whose power of eminent domain has not been exercised. In either case the railway company may alter the existing route.

Some of the states were slow in granting relief from the effects of strict judicial construction of railway charters in the matter of altering route. In New York the decision of the court of appeals in the case of *Erie Railroad Co. v. Steward*, 170 N. Y. 172 (1902), holding a railway company could not go outside of its established route and condemn land for a cut-off over which to operate freight trains at a saving of about three miles, occasioned amendment of the railway law permitting condemnation for cut-offs, and for shortening or straightening or improving the line or grade of a railway. (*Long Island R. R. Co. v. Sherwood*, 205 N. Y. 1, 5.) In this state an act was passed in 1864 to enable railway companies to acquire land for railway purposes by applying to the board of county commissioners to lay off route and assess damages. (Laws 1864, ch. CXXIV.) In 1865 a general act was passed for the incorporation of railways. Sections 3 and 11 read as follows:

"SEC. 3. Any corporation formed in pursuance of this act shall be and is hereby authorized to construct and maintain a railroad with single or double track, with such sidetracks, turnouts, offices and depots as it may deem necessary between the points named in the certificate, commencing at or within and extending to or into any town, city or village along the line of said road, or named as the place of the termini of such road, and construct branches from the main line to other towns or places within the limits of any county through which said road may pass."

"SEC. 11. That whenever any railroad company heretofore incorporated, or which may hereafter be incorporated, shall find it necessary, for the purpose of avoiding annoyance, public travel, or dangerous or difficult curves or grades, or unsafe or unsubstantial grounds or foundations, or for other reasonable causes, to change the location or grade of any portion of their road, whether heretofore made or hereafter to be made, such railroad companies shall be and are hereafter authorized to make such changes of grade and location, not departing from the general route prescribed in the certificate of such company; . . ." (Laws 1865, ch. XLIV.)

In 1866 an act supplemental to the act of 1864 was passed giving a railway company authority to apply to the judge of the district court for appointment of commissioners to assess damages occasioned by location of road. In the general revision of 1868 these statutes, with some revision, were consolidated in an elaborate chapter devoted to the subject of corporations, chapter 23. Article VI

was devoted to railway corporations; article VII to macadam and plank-road corporations; article VIII to telegraph corporations; article IX to the subject of appropriation of land for the use of railway, telegraph, macadam, and plank-road corporations. Power of a railway company to survey, lay out and construct was granted in article VI. Method of appropriating land was prescribed in article IX. The statute of 1868, with amendments not material here, and with topics rearranged in a manner also not material, was carried into the revision of 1923. Chapter 23, article VI, section 50, Rev. Stat. 1868, is now R. S. 66-502, and reads as follows:

"The directors of any railway corporation may, by a vote of two-thirds of their whole number, at any time change the roadbed; or road line, or any part thereof, for the purpose of shortening the line, or to overcome natural obstacles; but such corporation shall not change the general route or terminus of the road."

Plaintiff's petition did not negative lawful appropriation of land under this section, and consequently did not state a cause of action for injunction preventing the railway company from enjoying the fruits of condemnation. The petition did say the purpose of the condemnation was simply for relocation of the right of way for convenience and economy of the company, and the condemnation was not necessary for the public welfare or safety. These allegations did not, however, disclose general change of road or termini, and did not show that condemnation was not instituted pursuant to action of the board of directors for the purpose of changing the roadbed and line, to shorten the line and overcome natural obstacles. The question whether relocation for those purposes will promote public welfare and safety has been determined by the legislature. Its judgment is entitled to respectful consideration. (*State, ex rel., v. Kemp,* 124 Kan. 716, 719, 261 Pac. 556.) The judgment of the legislature was manifestly sound in 1868, and the court holds a present taking of private property by a railway company pursuant to the relocation statute is a taking for public use.

Plaintiff says the condemnation petition did not disclose that the land was to be appropriated under the relocation statute. The function of the district judge was to appoint commissioners to assess damages to land to be taken for construction of a proposed road, and it was not a prerequisite to such appointment that the petition show whether the taking were for original location or relocation.

The court is already committed to the doctrine that power of eminent domain is not exhausted by a single exercise.

Section 81, chapter 23, General Statutes of 1868, is now R. S. 66-901, and provided for condemnation of land for right of way, and for sidetracks, depots, etc. Width of right of way was limited to 100 feet. Quantity of land for sidetracks, depots, etc., was limited by the needs of the company. The statute said nothing about subsequent appropriation of land, neither authorizing nor forbidding subsequent appropriation for right of way, or for sidetracks, depots, etc. In 1881 defendant's predecessor, the Atchison, Topeka & Santa Fe Railroad Company, needed more land for station grounds in the city of Atchison. The district court dissolved a temporary injunction forbidding the appropriation, and on appeal to this court the order of dissolution was affirmed. The syllabus reads:

"The Atchison, Topeka & Santa Fe Railroad Company, having completed the line of road authorized by its charter, and having once condemned land in the city of Atchison for depots, sidetracks, etc., and needing more room in said city for the transaction of its business, instituted proceedings for condemning more land: *Held,* That such proceedings could be maintained, and that under the statute the right of eminent domain was not terminated by the completion of the road, nor exhausted by a single exercise of the power." (*C. B. U. P. Rld. Co. v. A. T. & S. F. Rld. Co.,* 26 Kan. 669, syl. ¶ 1.)

Section 87 of the statutes of 1868 provided for assessment by county commissioners of the damages for a proposed road. In 1870 section 87 was amended to read as follows:

"That section 87 be so amended as to read: Section 87. That any railway corporation, instead of applying to the board of county commissioners as hereinbefore provided, or any person or persons through whose land or premises any railroad has been or is being constructed, may apply to the judge of the district court of the county through which any railroad is or is to be built, for the appointment of three commissioners to make the appraisement and assessment of damages instead of the county commissioners. . . ." (Laws 1870, ch. 74, § 2.)

In 1923 this part of the section was amended by a change of phraseology which did not affect meaning. (Laws 1923, ch. 166, § 2; R. S. 66-907.)

In the Atchison case the court put sections 81 and 87 together, and read them as follows:

"Any railway corporation may apply to the judge of the district court of the county through which its road is, or is to be built, for the appointment of three commissioners to lay off a route for such road, and also such land as

may be deemed necessary for sidetracks, depots, etc." (*C. B. U. P. Rld. Co. v. A. T. & S. F. Rld. Co.*, 26 Kan. 669, 677.)

Concerning method and result of this interpretation, the court said:

"All legislation must be construed in the light of existing facts, and while a grant like this is doubtless to be strictly construed, yet such rule of construction does not forbid giving just and reasonable force to all the separate provisions of the statute, nor prevent its being interpreted by the actual experiences and necessities of life. . . . Reading the grant in that way, it would seem that the power is given to condemn land for terminal facilities whenever deemed necessary, and that one exercise of the power did not exhaust it." (p. 677.)

The case involved terminal facilities only. As construed by the court, the statute covers route of road the same as terminal facilities, and the reasoning by which application of the statute to terminal facilities was justified applies to such changes of route as may be necessary to modernize the road.

"Railroads, as all know, are things of growth; they enlarge with the development of the country. Starting as small enterprises doing a trifling business, as the country develops they extend—their business expands—that which in the inception afforded ample facilities becomes inadequate for the increasing business, and the company stands between two difficulties. It must either imperfectly discharge its duties to the public, and thereby expose itself to liability for damages, or must enlarge its facilities, which, if it cannot be done by the power of eminent domain, will expose it to any exorbitant demands for land which business rivals or avaricious individuals may see fit to exact. This defendant's history fully illustrates this fact. It is but a few years since it commenced building its road. At first it was but a feeble corporation with but a few miles of track, and one whose business needed little rolling stock and very slight terminal facilities. Now it has become a gigantic corporation, owning hundreds of miles of road and part of a transcontinental line. . . .

"Now, is it not reasonable to suppose that it [the legislature] would legislate in harmony with rather than counter to this law of railroad growth? Is it not more reasonable to believe that it intended to give the power to take such land as might be needed, when it should be needed, and thus enable the company fairly and fully to discharge its duties to the public?

.   .   .   .   .   .   .   .   .   .   .   .   .

"It must be borne in mind that our railroad corporations are now organized under a general law; that a general law makes all the provisions for exercising the right of eminent domain; that no special charters and no special corporate powers are granted. The legislature in its enactments is not determining as to the necessities or probabilities of any particular road, but is laying down a general law for the regulation and control of all railroad companies. Such a general law should be in harmony with the experience of the country as to the necessities and growth of railroad corporations." (pp. 677, 678, 679.)

This was written by David J. Brewer, in the same year that O. W. Holmes, Jr., published his lectures on "The Common Law," the first of which contained the statement: "The life of the law has not been logic; it has been experience." Both men became justices of the supreme court of the United States.

A statute authorized cities of the second class to exercise power of eminent domain for waterworks. In 1883 the city of Winfield exercised the power and constructed a waterworks system. In 1914 the city condemned a water privilege a mile from the original location. The court held the power to condemn was not exhausted by the first exercise. In the opinion it was said:

"All property is held subject to the right of eminent domain whenever the public necessity requires it. It is a continuous sovereign right which cannot be extinguished. The fact that the power delegated by the legislature to the defendant was exercised thirty-three years ago does not argue that the property deemed necessary for public use at that time meets the requirements of the present time, nor does it exhaust the power where those intrusted with its exercise determine that additional or other property is necessary to the public convenience or welfare. . . . The power to condemn is given to the city in general terms, and nothing in the language of the act indicates a legislative purpose to limit the exercise of the power to a single instance or to one set of proceedings. . . .

"The facilities at the old location may be wholly inadequate at the present time and the conditions that exist there may be such as to demand a change of intake. The city is growing, and it is easy to understand that a plant deemed to be sufficient for the people a third of a century ago would not be sufficient to meet the demands for the greater population or to subserve the present public interest." (*Wallace v. City of Winfield,* 98 Kan. 651, 655, 656, 657, 159 Pac. 11.)

In the Winfield case the power was exercised by a municipal corporation. The city, however, sold water to its inhabitants, as defendant sells transportation. The decision was not rested on the ground the grantee of the power of eminent domain was a public corporation exercising governmental power, but on the ground the power of eminent domain is a continuing power, the first exercise of which does not exhaust it.

In view of the decisions in the Atchison and Winfield cases, adoption now by this court of the rule that power of eminent domain is exhausted by the first exercise, and may not be resorted to by a railroad company, subject to express statutory limitations, for the purpose, for example, of eliminating or reducing curves, grades, and detours of its completed road, would be an anachronism.

The petition charges relocation of right of way. The expression is too indefinite to afford information respecting what defendant is actually doing, and the court has used the word "relocate" as conveniently descriptive only.

The judgment of the district.court is reversed, and the cause is remanded with direction to sustain the demurrer to the petition.