**MID-AMERICA PIPE LINE COMPANY, a corporation, Plaintiff,**

**v.**

**MISSOURI PACIFIC RAILROAD COMPANY, a corporation, Defendant.**

**Civ. A. No. W–3969.**

United States District Court
D. Kansas.

Feb. 8, 1969.

Hershberger, Patterson, Jones & Thompson, Wichita, Kan., Eugene G. Bell and John Cbronister, Tulsa, Okl., for plaintiff.

Lilleston, Spradling, Gott, Stallwitz & Hope, Wichita, Kan., Gleysteen, Nelson, Harper, Kunze & Eidsmoe, Sioux City, Iowa, for defendant.

### MEMORANDUM

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WESLEY E. BROWN, District Judge.

This is an injunction action arising out of Mid-America Pipeline Company's construction of an anhydrous ammonia pipeline across defendant's railroad right of way at seven locations in the State of Kansas. It is before the Court for entry of findings of fact and conclusions of law following trial to the Court and oral argument. The temporary injunction entered in March 1968 remains in effect but by agreement of the parties the bond has been discharged.

Fundamentally this case involves the interpretation of K.S.A. 17–618, an eminent domain statute, as it applies to Mid-America, plaintiff at bar. Mid-America is a corporation organized under the laws of the State of Delaware with its principal place of business in Tulsa, Oklahoma. Defendant Railroad is a corporation organized under the laws of Missouri and having its principal place of business in St. Louis, Missouri. In an injunctive action, as the one at bar, the amount in controversy is the value of the right to be protected. Pyramid Life Ins. Co. v. Masonic Hosp. Ass'n of Payne Co., 191 F.Supp. 51 (W.D.Okl.1961). Mid-America cannot complete its estimated $13,300,000.00 anhydrous ammonia pipeline unless it can protect its crossing rights at the seven points where the line intersects the railroad's easements in Kansas. The Court thus finds that the amount in controversy exceeds $10,000.00 exclusive of costs and interest and the Court concludes that it has jurisdiction pursuant to § 1332.

### FINDINGS OF FACT

1. Mid-America was organized in 1958 as a publicly owned common-carrier and commenced operations in the interstate transportation of natural gas liq-

uids through its petroleum products pipeline in 1960. The Railroad presently holds easements for railroad purposes throughout the State of Kansas. Pursuant to revocable license agreements executed in 1960, Mid-America's petroleum products pipeline crosses Railroad easements at several locations in Kansas.[1] Mid-America has begun construction of a second pipeline, running parallel to the petroleum products line, which will be used to transport liquid anhydrous ammonia.[2] In October 1967 the Railroad through one of its general managers, executed seven revocable license agreements granting Mid-America the right to cross defendant's easements with the anhydrous ammonia pipeline.[3] Then, by letter dated February 23, 1968, the Railroad gave Mid-America a 30-day notification that the aforesaid licenses were to be cancelled.[4] The Railroad is not faulted because it admits that competition played a role in the cancellation.[5] Following receipt of the cancellation letter, Mid-America instituted proceedings in the state district courts of Pratt, Reno, Saline and Washington Counties, Kansas for the purpose of condemning a 60-foot right of way across Railroad's easements at the seven locations noted in the cancelled license agreements.[6] On March 15, 1968 Mid-America filed this action seeking a restraining order and praying for a permanent injunction which would enjoin the Railroad from interference with (a) construction of the anhydrous ammonia pipeline and (b) operation of the petroleum products pipeline. The restraining order, currently in effect, was issued at that time.

2. We are not concerned with the question of damages, or with the right of Mid-America to condemn in connection with its petroleum products pipeline. The parties have stipulated as to damages. Mid-America's pipe line for petroleum products is in operation, and has been for some time. The sole issue for this court's determination concerns the right of Mid-America to condemn for purposes of the second pipeline, designed to carry anhydrous ammonia. Railroad concedes that the pipeline crossings which have already been constructed for the anhydrous ammonia line are in accordance with its requirements and specifications. [Tr. 7].

3. In its early stage Mid-America's petroleum products line was connected to twenty-eight gasoline plants and one refinery along with seven distribution terminals. Today the pipeline is joined with fifty-six gasoline plants, five refineries and has fourteen distribution terminals. The types of petroleum products transported by the line have increased from one to seven, while the number of shippers serviced has grown from twelve to ninety.[7] Among petroleum products transported by Mid-America as common carrier are propane, butane, raffinate and natural gasoline. The operations of the 2700 miles of petroleum products pipeline are confined to common carrier services in and through some ten states. Services on the line are governed by tariffs filed by Mid-America with the Interstate Commerce Commission (ICC). While Mid-America has no contracts similar to a "throughput agreement" with its propane shippers, it does have what are tantamount to "pipeage contracts" with shippers of specialty products on the petroleum products line.[8]

1. Complaint ¶¶ 1, 2; Answer 2nd Defense ¶¶ 1, 2; Trans. Pp. 52, 59–60.

2. Ex. 1; Trans. Pp. 61–73, 116.

3. Complaint ¶ 5 and Ex. 8 attached thereto; Answer 2nd Defense ¶ 5; Trans. Pp. 6–7, 25–26, 74–75. ·

4. Complaint ¶ 5 and Ex. 9 attached thereto; Answer 2nd Defense ¶ 5; Trans. Pp. 25–26, 78.

5. Trans. Pp. 236–237.

6. Complaint ¶ 6; Answer 2nd Defense ¶ 6; Trans. Pp. 6–9.

7. Complaint ¶ 2 and Ex. 1 attached thereto; Answer 2nd Defense ¶ 2; Ex. A; Trans. Pp. 41, 54, 59–62.

8. Complaint ¶ 2; Answer 2nd Defense ¶ 2; Trans. Pp. 26, 191, Ex. 5; Trans. Pp. 193–194.

4. Mid-America first considered utilizing the petroleum products pipeline for the transportation of anhydrous ammonia, but discarded the notion as not being economically feasible when it was discovered that the propane and anhydrous ammonia seasons overlapped.[9] Before undertaking construction of the second line, Mid-America made offers to three corporations to construct an anhydrous ammonia line.[10] On July 14, 1967 Mid-America entered into a twenty year "throughput agreement" with Hill Chemical Company (Hill). This was Mid-America's first firm commitment and the agreement, as amended, provides that Mid-America will ship anhydrous ammonia from Hill's plant at Borger, Texas to distribution terminals at Conway, Kansas, Beatrice and Greenway, Nebraska, and Whiting, Early, Gardner, Sandborn and Ogden, Iowa. Under an addendum, Hill may direct Mid-America to delete either the leg leading to Sandborn, Iowa or the leg going to Ogden, Iowa or both.[11]

5. Volumetrically, the agreement provides that Mid-America will transport a minimum of 1,200 tons per day from Hill's single plant at Borger, Texas or 2,000 tons per day if Hill should decide to construct a second plant. Mid-America may be required to shift around up to 8,000 tons per day among various storage facilities and terminals in Iowa.[12] The present capacity of the anhydrous ammonia line is 1,300 tons per day and it may be increased to 3,000 tons per day by the addition of five booster stations. The practical economic capacity of the line is 5,000 tons per day, although this capacity could be further increased by additional booster stations if the economics of the situation are ignored. Mid-America contemplates the addition of booster stations as traffic develops.[13]

6. Under the 1200 tons per day minimum contract with Hill, Mid-America's anhydrous ammonia pipeline is a "very marginal project financially." The line must have other business to be successful, and Mid-America has always planned to get additional business. Mid-America is and has been actively soliciting additional business for its new line from members of the public both producing, and using anhydrous ammonia.[14]

7. In late August or early September 1967 Mid-America contracted for the necessary tonnage of pipe for the construction of the anhydrous ammonia line. Mid-America submitted the design of the new line to the Federal Transportation Department and in January 1968 received a letter from that department to the effect that the design comported with the requisite safety standards.[15] The anhydrous ammonia line has now been installed at the seven crossing points in Kansas and some 225 miles of pipe have been laid in this state. Of the estimated $13,300,000.00 total cost of the line, some $5,500,000.00 has already been expended. In addition, each booster station on the line will cost about $150,000.00 to construct.[16]

8. Anhydrous ammonia, simply defined, is water-free ammonia. As such, it is composed of one part nitrogen, three parts hydrogen. In content, the nitrogen component represents 83–84% of the total weight. In America plants, most of the hydrogen content of ammonia is derived from natural gas, and it is classed as a petroleum product when so derived. The source of the nitrogen component is principally derived from the air, although some nitrogen may come from the gas stream itself. The raw materials used in producing anhydrous ammonia are natural gas, steam and air. The usual manner of production is by mixing the

9. Trans. Pp. 63–64, 102–103.

10. Trans. P. 67.

11. Ex. B; Trans. Pp. 69, 104, 110–111, 158.

12. Ex. B, Trans. P. 158.

13. Ex. 6; Trans. Pp. 70, 157, 200–205.

14. Tr. 70, 73, 118–119, 122–125.

15. Trans. Pp. 73–74, 127–129, 149–150.

16. Trans. Pp. 85, 201.

natural gas with steam at high temperatures; hydrogen is extracted from the hydrocarbons, and this hydrogen is then combined with nitrogen from the air, again at an elevated temperature, and then passed over a different catalyst to produce the ammonia. The principal component of the natural gas from which the hydrogen is taken in this process is the methane in the natural gas stream. After the hydrogen and nitrogen have been combined, as above described, ammonia is produced. Ammonia is a non-flammable gas that is standard at ordinary temperatures and pressures. Ammonia gas may be liquefied by applying either pressure, or by cooling it. Because of ease in transportation, ammonia is usually transported in liquid form.[17]

The molecules of anhydrous ammonia resemble those of methane, its principal constituent, in that they contain the same number of electrons. Anhydrous ammonia differs from methane only in that the carbon nucleus (charge +6) and one of the four hydrogen nuclei (charge +1) have been replaced by a nitrogen nucleus (charge +7). As a consequence of this less symmetrical distribution of charge, the ammonia molecule has an electric dipole moment which gives rise to strong attraction among the molecules, causing them in liquefy under a pressure of 8.8 atmospheres at 70° F. All gases may be converted to a liquid state. Most gases may be liquefied by pressure alone at ordinary temperatures. Propane may be so liquefied under pressure of 8.5 atmospheres, and butane under pressure of 2.2 atmospheres, at temperatures of 70° F.[18] Propane, butane, raffinate natural gasoline, and ethane-propane feedstock, all products which are being shipped by Mid-America through its present pipeline, are classified as hydrocarbons, and are used as a fuel or to produce fuels. Anhydrous ammonia is not classified as a hydrocarbon, and it is not used as a fuel.[19]

9. Anhydrous ammonia is principally used as an agricultural fertilizer, the nitrogen component being most useful in increasing crop production, with the hydrogen component making the substance soluable in water so that the nitrogen can be effectively assimilated by the plant life. While this product is often mixed with other fertilizers, it is widely used in direct applications to the soil. In less than the past decade, this direct application usage has enjoyed an annual increase of from 16% to 25% since 1960, or about 600% overall during that period. In the State of Kansas, the use of anhydrous ammonia increased from 16,000 tons in 1960 to 150,000 tons in 1967.[20] Overall production of the product in the states of Kansas, Nebraska and Iowa has perhaps exceeded agricultural consumption within those states, but it can not be determined from this record what portions of that production may have been absorbed by industry, export, or other non-agricultural uses. An important factor in meeting the demand for anhydrous ammonia is the ability to transport it to the farmer at the time of his greatest need, when weather, soil and other conditions are right for application. In this respect, distribution of liquid products through a pipe line, directly to the consuming area has proved more economical and efficient than some other forms of transportation, for even though there may be sufficient product in the area, extreme difficulty may be experienced in obtaining shipments into the area of need by ordinary forms of transportation.[21]

10. The principal sources of increase in the consumption of anhydrous ammonia in Kansas are in its use as an agricultural fertilizer, and also to more intensive farming efforts to increase land productivity due to government allotments that limit the amount of land to be farmed. [Tr. 66]. Kansas, being one of the prime states in the feed grain pro-

17. Testimony of Buess, Trans. Pp. 35 et seq.

18. Affidavit of Harris, Ex. 6, Complaint.

19. Trans. p. 49.

20. Trans. p. 65.

21. Trans. Pp. 217–232.

duction of the United States would figure dramatically in any future developments of increased agricultural production, because of its temperature and soil condition. Anhydrous ammonia would be a large contributing factor to the increased production of grain in Kansas. [Tr. 216–218].

11. Mid-America has several subsidiary corporations which are engaged in other businesses. Among them is Thermo-gas which sells anhydrous ammonia in addition to other products at four locations in Iowa.[22] There is also a new acquisition named Indian Point Farm Supply which markets liquid fertilizer under the brand name of "Hopcaid" through a number of franchised outlets in Illinois, Indiana, Wisconsin, Missouri, Ohio and Iowa.[23] Mid-America, however, will not own any of the anhydrous ammonia transported through its pipeline, and it will not possess any interest in the terminals on the line.[24]

12. It has been stipulated that Mid-America is a common carrier in interstate transportation, and subject to regulation and control by the Interstate Commerce Commission in connection with its present operation of its first pipeline, referred to as the "products line." [Trans. Pp. 190–192]. Tariffs which have been filed with the Commission for operation of the products line, contain provision for pipeage contracts in those cases in which the shipper is outside of the regular pipe line system. Through these pipeage contracts, provision is made for extension of the line according to the needs of the shipper, in return for guarantees of shipments or other arrangements which would justify the extension. [Trans. Pp. 195–196].

13. Mid-America's evidence establishes that it is its intention to operate the anhydrous ammonia pipeline as a common carrier, similar in manner to that of the products pipeline now in use. In addition to the testimony of Mr. Roach

in this respect, the Court finds that the contract with Hill Chemicals, Inc., Exhibit B, indicates that Mid-America entered into this agreement, as a common carrier, and assumed obligations, as a common carrier, for transportation of anhydrous ammonia. Specifically, provision is made that Mid-America shall maintain and operate the line as a common carrier (Clause 1); that Hill's ammonia may be commingled with that of other shippers (Clause 4); that minimum gross revenue, as guaranteed by Hill, will be credited with revenue derived from other shippers (Clause 8); that the line will be operated by Mid-America as a common carrier and "for the benefit of the shipping public"; that published tariffs will be filed and Hill's costs will not exceed these tariffs (Clause 11).

14. On May 29, 1968, Mid-America filed with the ICC its "Local Pipe Line Tariff, Number 2, ICC #3, applying to anhydrous ammonia shipped by pipeline from Borger, Texas to Iowa, Kansas, and Nebraska destinations, and from Beatrice, Nebraska to Iowa, and Nebraska destinations. Included in this tariff is provision for pipeage contracts which may be required by Mid-America before transportation of products not delivered by the shipper to the point of origin. [Ex. 1, Proposed Findings].

## CONCLUSIONS OF LAW

The controversy between the parties centers upon three principal issues:

1. Does the Railroad have standing in this action to object to Mid-America's exercise of the power of eminent domain?

2. Does Mid-America have the power of eminent domain under the provisions of K.S.A. 17–618 for the purpose of gaining easements by condemnation for its anhydrous ammonia pipeline?

3. Does the use sought to be secured by Mid-America for its anhydrous

---

22. Trans. Pp. 54, 93–94.

23. Trans. Pp. 55–57, 95–100, Ex. A.

24. Trans. Pp. 71–72, 173.

ammonia pipeline, as disclosed by the evidence in this case, constitute a "public use?"

Upon the basis of the foregoing findings of fact, the Court makes the following conclusions of law.

### A. *The Railroad's Standing*

■ Throughout this case, Mid-America has questioned the motives of Railroad in its attempts to resist the pipeline's plans to carry anhydrous ammonia by underground system through Texas, Oklahoma, Kansas, Nebraska, and Iowa. It seems clear from the record that Railroad's primary concern is to prevent Mid-America from becoming an active competitor for transportation revenues which are derived from the shipment of anhydrous ammonia. While the question of loss of revenue to the railroad has no bearing upon the question of whether or not Mid-America possesses the power to condemn, the Court concludes that the motive of Railroad has no bearing whatsoever upon its standing to question that power of condemnation.

■ In this diversity action, the law of Kansas controls the substantive aspects of the case. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Railroad's ownership of right of way easements gives it an interest in land long recognized as compensable in condemnation proceedings. C. K. & W. Rld. Co. v. Comm'rs of Chautauqua Co., 49 Kan. 763, 31 P. 736 (1892). Eminent domain proceedings in Kansas are in the nature of an inquest proceeding, and they are not classified as judicial actions. Urban Renewal Agency of Kansas City v. Decker, 197 Kan. 157, 415 P.2d 373 (1966). Thus, under Kansas law, if the owner of an interest in land wishes to contend that the condemnor is exceeding its powers, or that the condemnation is for an improper purpose, such as a private use, it must do so by bringing a separate injunctive action in a court of competent jurisdiction. State v. Boicourt Hunting Ass'n., 177 Kan. 637, 282 P.2d 395 (1955).

■ The right of condemnation may be tested by injunctive action brought in the federal district court. In Cline v. Kansas Gas & Electric Company, 182 Kan. 155, 318 P.2d 1000 (1957), the state court approved the *Boicourt* ruling, but reversed a jury award for condemnation damages and remanded the case for a new trial. While the second trial was pending, Cline filed suit in federal court to contest the exercise of eminent domain, and this issue was fully determined in accordance with Kansas law. Cline v. Kansas Gas and Electric Company, (10th Cir. 1958) 260 F.2d 271.

■ In the present action, the condemnor has filed the injunction suit, and the owner of the interest in the land—the Railroad—has put in issue the right of Mid-America to exercise eminent domain powers in establishing crossing rights for its anhydrous ammonia pipeline. Since the Railroad could have raised the issue had it filed the suit, it may raise it in defense of the action brought by Mid-America.

### B. *The Power of Eminent Domain Under K.S.A. 17–618.*

■ The power to appropriate private property for public use is possessed by the sovereign. Under the law of Kansas, the power of eminent domain can be exercised only by virtue of legislation, and in the absence of an express legislative grant, such power lies dormant in the state. For a valid exercise of the power, three things are required: 1. provision must be made for payment of just compensation; 2. the property is to be devoted to a public use; and 3. there be a public need for such use. Under normal conditions, statutes granting the power of eminent domain should not be enlarged by implication. Cline v. Kansas Gas and Electric Company, *supra*, 260 F.2d 271, 273; Strain v. Cities Service Gas Co., 148 Kan. 393, 83 P.2d 124; Sutton v. Frazier, 183 Kan. 33, 325 P.2d 338; Isley v. Bogart (10th Cir. 1964) 338 F.2d 33.

Mid-America bases its power of condemnation upon the provisions of K.S.A. 17–618, which provides:

"Lands may be appropriated for the use of macadam-road, plank-road, hospital corporation or association, telegraph and telephone corporations, electric, hydraulic, irrigating, milling and manufacturing corporations using power, oil companies, pipe-line companies, and for the piping of gas in the same manner as is provided in sections 1 to 16 [26–501 to 26–516], inclusive of this act, and any macadam-road, plank-road, telegraph and telephone corporations, hydraulic, irrigating, oil company, pipe-line company, gas company partnership holding a certificate of convenience as a public utility issued by the state corporation commission, milling or manufacturing corporation using power desiring the right to dam or take water from any stream, to conduct water in canals or raceways or pipes, or to conduct compressed air in pipes, or to conduct oil in pipes or conduct gas in pipes, or transmit power or communications by shafting, belting, or belting and pulleys, or ropes and pulleys, or by electrical current, or by compressed air, may obtain such right or the right of way for all necessary canals, raceways, pipes, shafting, belting and pulleys, ropes and pulleys or wires or cables in manner as aforesaid * *."

Compressed into pertinent terms, the statute reads:

"Lands may be appropriated for the use of * * * pipe-line companies, and for the piping of gas in the same manner as is provided in sections 1 to 16 [26–501 to 26–516], inclusive of this act, and any * * * pipe-line company * * * desiring the right to * * * conduct gas in pipes * * *

may obtain such right or the right of way for all necessary * * * pipes * * * in manner as aforesaid.[25]"

The Railroad contends that anhydrous ammonia is not a "gas" within the meaning of Section 17–618, in that the term must be construed to be limited to gas used for light, fuel and power.

The Kansas courts have never defined the words "gas" as used in 17–618. They have determined that companies organized for "the purpose of piping and distributing gas for light, fuel, and power are given authority to exercise the right of eminent domain." We do not construe this to be a definition of "gas" but merely a description of the corporation entitled to exercise the right of eminent domain.[26] They have also held that the "production and distribution of natural gas for light, fuel and power affect the people generally to such an extent that the business may be regarded as one of a public nature, * * * the control of which belongs to the state."[27] Again, this is a definition of the public nature of the business. We do not read these cases as definitions of or a limitation to the word "gas."

In 1917 the legislature amended the act which was interpreted in the *Natural-Gas* and *LaHarpe* cases by adding authority for "oil companies" and "pipe-line companies" to exercise the power of eminent domain for the purpose of conducting "oil in pipes" or "gas in pipes." The previous act had permitted the "conduct of gas in pipes" but had not included the conduct of oil in pipes.

In Ritchie v. Atchison T. & S.F. Rly. Co., 128 Kan. 637, 279 P. 15 (1929), the Kansas Court had before it the question of the power of the Railway Company to relocate its right of way across new portions of land. In holding that the power of eminent domain was not ex-

25. Sections 26–501—26–516 referred to above are procedural statutes and contain no grant of power.

26. The State v. Kansas Natural-Gas, etc., Company, 71 Kan. 508, 509, 80 P. 962, 963 (1905).

27. LaHarpe v. Elm Township Gas, etc., Company, 69 Kan. 97, 100, 76 P. 448, 449 (1904).

hausted by the original condemnation, the court made some observations which lend some light on our problem here.[28]

In noting the observation by O. W. Holmes, Jr. that "The life of the law has not been logic; it has been experience," the Court quoted with approval this language from C.B.U.P. Rld. Co. v. A.T. & S.F. Rld. Co. (1881) 26 Kan. 669, 677:

"'All legislation must be construed in the light of existing facts, and while a grant like this is doubtless to be strictly construed, yet such rule of construction does not forbid giving just and reasonable force to all the separate provisions of the statute, nor prevent its being interpreted by the actual experiences and necessities of life. * * * Reading the grant in that way, it would seem that the power is given to condemn land for terminal facilities whenever deemed necessary, and that one exercise of the power did not exhaust it.'" [128 Kan. at 644, 279 P. at 18].

The *LaHarpe* and *Ritchie* cases were referred to by the Kansas Court in Strain v. Cities Service Gas Co., 148 Kan. 393, 83 P.2d 124 (1938). There the Court held that the condemnation of land for an underground storage reservoir for gas was not authorized by Section 17–618. In so holding, the Court reasoned at Pp. 396–397, 148 Kan., at p. 127, 83 P.2d:

"Normally, at least, statutes granting the right of eminent domain should never be enlarged by implication. Appellant contends, and its reasoning leads to that end, that the statutes should be interpreted as giving it the right to condemn any property necessary, or which it deems necessary, in the conduct of its business. Obviously this contention is too broad. It would authorize appellant to condemn any land in which its officials thought gas might be found, if more gas than it had available was thought necessary to supply its demands. This

would disrupt the whole theory of gas ownership, production and distribution which now prevails. Certainly our legislature never contemplated granting gas companies such authority.

\* \* \* \* \* \*

"The use of the earth as a storage place for gas is an idea so novel, we cannot believe the legislature had such matter in contemplation when the power of eminent domain was given to pipe line companies. If the rights contended for by appellant are to be given to gas pipe line companies, it is a matter for the consideration of the legislature. To stretch the statute to cover the case here presented would be little short of judicial legislation."

The rule of strict construction of eminent domain statutes where the state confers its powers on others is of course proper. However, the Kansas decisions disclose that limitations will not be read into the condemnation statute simply because new trends, methods or uses have developed which were not within the original contemplation of the legislature. Indeed, the Kansas court recognized this factor at an early date, when it remarked in the *Natural Gas* case, *supra*, 71 Kan. at pp. 509–510, 80 P.2d at p. 963:

"Public highways are arteries of communication and of intertraffic in the commodities of the country. The means to accomplish these purposes change with the advance of civilization. * * *

\* \* \* \* \* \*

"The contention of the state is that the use which the gas company is making of the highway is exceptional, and may be exercised only under a franchise from the state, mediately or immediately. We think this is an overstatement of the proposition. The use is not exceptional. The transportation of commodities on the highway is one of the uses for which it has always been maintained. The means, how-

---

28. The history of eminent domain as stated by Justice Burch in the case is recommended reading.

ever, used by the gas company in the transportation of its gas are exceptional; [burying gas lines in the public highway]. *a demand for this method has not heretofore existed in this state.* But shall this fact alone deprive the defendant of the use of the highway for a usual and proper purpose, unless such use necessarily obstruct, seriously inconvenience, or endanger public travel?" [Emphasis supplied.]

The term "gas" as used in the condemnation statute is not defined or limited to any particular type of gas, natural, hydrocarbon, or otherwise. By the terms of the statute, it seems clear that a pipeline company could transport oil, water, compressed air, or gas, or any combination of those items. In Northern Natural Gas Company v. Grounds (1968) 292 F.Supp. 619, this Court ruled that the term "gas" as used in gas leases, without other qualification, would not be construed as being limited to gaseous hydrocarbons. In so ruling, the Court discussed the meaning of the word "gas" in its ordinary sense:

"The word, 'gas', has two different meanings with which we are concerned. As a general term used in a physicist's sense to describe a state of matter, it is defined typically as an 'aeriform fluid having neither independent shape nor volume but tending to expand indefinitely.' It is also used to describe natural gas, which is defined typically in mining and petroleum industry glossaries as 'a mixture of gaseous hydrocarbons found in nature. * * *' Nothing in the history of the word 'gas' itself supports the argument that it defines only gaseous hydrocarbons. The word 'gas' was coined in the early 17th Century by a Dutch chemist, J. B. Von Helmont, from the Greek word 'chaos' to signify a 'spirit not capable of being coagulated.' It later came to mean an 'aeriform fluid' used synonymously with air, and was subsequently restricted to permanently elastic fluids such as oxygen and hydrogen, as opposed to vapors, such as steam. In the 19th Century, it became common parlance for a mixture of carbureted hydrogen used to give heat and light, i. e., artificial gas. Gas as used to define natural gas, did not appear as a dictionary entry until 1914, after which time natural gas was commonly described as combustible gas formed in and issuing from the earth's crust. The term, 'natural', became affixed to gas to differentiate its superior fuel and illuminating qualities from artificial gas." 292 F. Supp. at 661. [Footnotes omitted].

All of the evidence before this Court indicates that anhydrous ammonia is a "gas" in the ordinary and general sense of the word. We can not impute to the legislature an intent to limit the transportation of a commodity by pipeline to certain component parts of that commodity. This would be like saying a railroad may transport wheat, but not flour, because it was authorized to haul grain.

■ The Court concludes that the conduction of anhydrous ammonia by pipeline is within the meaning of the term "to conduct gas in pipes" and that Mid-America therefore has the power of eminent domain in securing rights of way for all necessary pipes under the provisions of K.S.A. 17–618.

■ The Court also concludes that the requirement that there be a public need for the proposed use is satisfied. All of the evidence establishes that anhydrous ammonia is of considerable importance to agriculture in the states of Kansas, Nebraska, and Iowa. Its use has enjoyed a tremendous growth over the past few years, and increased production and distribution has enabled the price to decline between 20% and 25% in the past year. The importance of transporting anhydrous ammonia in sufficient quantities to geographical areas where and when it is needed would appear to be a significant factor in its beneficial and economic use. By placement of strategic terminal locations, Mid-America should

be able to expedite delivery to a particular area when weather, demand and planting conditions are right for proper application of anhydrous ammonia.

 The Court further concludes that the proposed use will be a "public use," and that Mid-America will operate as a common carrier of anhydrous ammonia. While Mid-America will begin operation of the anhydrous ammonia line with one shipper, it is committed to Hill for only ⅖ of the practical economic volume of the pipeline. It will own neither the products transported nor the terminals on the line. Like the early stages of Mid-America's petroleum products pipeline, the anhydrous ammonia line has room to grow in the number of shippers serviced. In furtherance of this goal, Mid-America has filed tariffs with the ICC, thereby holding itself ready to transport anhydrous ammonia for all shippers under the terms of that instrument. See State ex rel. Fatzer v. Sinclair Pipe Line Co., (1956) 180 Kan. 425, 439, 304 P.2d 930.

On similar evidence to that presented to this Court, Mid-America was recently successful in securing condemnation rights for its anhydrous ammonia pipeline in hearings before the Iowa State Commerce Commission. In the Matter of the Petition of Mapco, Inc. etc. Decision and Order August 21, 1968, Dockets P–657, P–660. (Appeal pending). In that proceeding the Commission held that the proposed use would satisfy a public need, and that the proposed use would be a "public use," available without discrimination to all shippers of anhydrous ammonia.

The Court concludes that the transportation of anhydrous ammonia by Mid-America, as a common carrier, constitutes a public use for which the power of eminent domain has been granted under the provisions of K.S.A. 17–618.

The temporary injunction heretofore granted will be made permanent. Prevailing counsel will prepare, circulate and submit a form of judgment consistent with the views expressed herein.